UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JEREMY SCHOUWEILER, a seaman,<br><br>                      Plaintiff,<br><br>    v.<br><br>WESTERN TOWBOAT COMPANY, a Washington corporation; and the T/V WESTERN MARINER, a vessel, Official No. 656807, along with all engines, gear, *in rem*,<br><br>                      Defendants. | No. C05-502Z<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

## **INTRODUCTION**

This matter came on for trial on November 5, 2007, before the Court, sitting without a jury. Plaintiff was represented by H.L. George Knowles and Thomas Evans of Injury at Sea. The *in personam* defendant was represented by Tom Waller of Bauer Moynihan & Johnson. At the conclusion of trial the Court took the matter under advisement. The Court has now considered the evidence presented at trial, the deposition testimony of James Swanson and Joseph Noonan, M.D., the exhibits admitted into evidence, and the arguments of counsel. The Court being fully advised, now makes the following Findings of Fact and Conclusions of Law:

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

## FINDINGS OF FACTS

1. Plaintiff Jeremy Schouweiler resides in Elma, Grays Harbor County, Washington. Plaintiff worked sporadically in the fishing industry, at sea, for at least ten years prior to the Fall of 2001. He worked on the open decks of fishing boats in various weather and sea conditions. Plaintiff was employed on about November 4, 2001, as a deckhand by Defendant Western Towboat Company ("Western Towboat") aboard the tug WESTERN MARINER. Plaintiff was a seaman at all times material to this litigation and employed in furtherance of the purpose of the mission and function of the WESTERN MARINER.

2. Western Towboat is a corporation established under the laws of the State of Washington, with its offices located in Seattle. Western Towboat owned and operated, at all relevant times, the towing vessel WESTERN MARINER, official number 656807. The WESTERN MARINER'S home port is Seattle, Washington.

3. The BARANOF PROVIDER, official number 639267, is a wood-deck cargo barge. The barge was towed at all times material by the WESTERN MARINER. The barge BARANOF PROVIDER is 202 feet in length and 60 feet wide. The barge was not owned or chartered by Western Towboat.

4. At all relevant times, the vessel WESTERN MARINER and the barge BARANOF PROVIDER operated in navigable waters.

5. The wood deck of the BARANOF PROVIDER was equipped with recessed lash down pockets, approximately 19" x 11". See photos Exhibit A-5. The lash down pockets were approximately 6" deep, matching the depth of the wood wear-deck. The lash down pockets housed pad eyes, secured to the underlying steel deck of the barge, to which shackles, turnbuckles and chains were regularly attached for cargo-securing purposes. There were approximately 30 pockets located in rows on the barge deck, equal distance from each side of the barge.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 2

6. In the Fall of 2001, plaintiff began work as a deckhand for Western Towboat. He was hired to serve on the Southeast Shuttle run in Alaska, serving the ports of Petersburg, Sitka, Kake and other destinations. His position with the company was considered a temporary employee. His temporary employee status did not change during his tenure with Western Towboat. Plaintiff worked approximately two hundred days as a deckhand prior to November 20, 2002. In his service with Western Towboat, plaintiff worked over 150 days aboard the WESTERN MARINER in the waters of Southeast Alaska.

7. At approximately 2:00 a.m. on November 20, 2002, the WESTERN MARINER, pulling the barge BARANOF PROVIDER, arrived in Sitka, Alaska and prepared to dock. The wind was calm and there was little or no current. The WESTERN MARINER was manned by Captain Dave Buotte, Mate Matt Miller, and the plaintiff who served as a deckhand. Both Captain Buotte and Mate Miller were skilled mariners in the operation of tug and barge operations. They were likewise experienced in the handling and navigation of the vessels in and out of the Port of Sitka.

8. Plaintiff Schouweiler was injured in the early morning hours of November 20, 2002, during the tie-up of the BARANOF PROVIDER at the Port of Sitka. It is undisputed that the plaintiff stepped into a lash down pocket on the BARANOF PROVIDER and sustained serious injuries to his ankle. The circumstances surrounding how and where the accident occurred are disputed. The Court finds that the location of plaintiff's accident on November 20, 2002, was on the port side of the BARANOF PROVIDER, outboard of the containerized cargo.

9. During the tie-up procedure for the barge in Sitka, the tug WESTERN MARINER would remain on the forward, port side, of the barge, opposite of where plaintiff would work to secure lines to the dock. The tug was equipped with forward flood and other lights that illuminated the port side of the BARANOF PROVIDER during tie-up in Sitka. The lights were routinely used during docking procedures.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 3

10.     Prior to the accident, plaintiff was directed to assist in tying up the barge as they neared the American Marine Lines dock at the Port of Sitka.  This requires grabbing a line as the barge comes up to the dock and is either done by reaching for the "spring line" by hand or using a pike pole to grab the line.  Only if the barge is directly adjacent to the dock can the spring line be reached without a pike pole.  There are a total of four (4) lines which eventually must be tied.  At the time of the accident the barge deck and the dock were approximately level with one another.

11.     Plaintiff testified that Captain Buotte was bringing the barge in too fast and that the barge was further away from the mooring dolphin on the dock than it should have been.  The Court finds from all the evidence that there was nothing unusual about the approach of the barge to the dock at the time of the accident.  The Court further finds that it was a routine tie-up at the dock in Sitka on the morning of the accident.

12.     Plaintiff testified that during the tie-up on the morning of the accident it was necessary to use a pike pole to reach up at about a 45° angle to attempt to secure the line.  Plaintiff testified at trial that there was a several foot difference between the barge and the dock containing the line that he had to reach.  Plaintiff even tendered into evidence a photo of his attorney reaching up in the manner he said he was reaching up.  See Ex. A-5 at pg. 29-43.  In contrast, at his deposition taken on November 21, 2005, he testified he could not remember the height difference between where he was standing on the barge deck and the top of the dolphin.  See Ex. A-19 at pg. 109.  He also testified at deposition that he could not remember if he was reaching up or down for the line.  Plaintiff also testified at trial that when he was reaching up he dropped the pike pole into the water and went to get another pike pole.  He claims to have stepped into the lash down pocket while going to retrieve a second pike pole.  The injury/accident report, Exhibit 9, prepared on the day of the accident by Captain Buotte states that plaintiff was "walking across deck to retrieve pipe [sic] pole" when he "stepped in a lash down pocket and twisted his ankle."  The evidence is in conflict as to whether plaintiff was retrieving a second pike pole.  The Court need not resolve this

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4

conflict of evidence. It was dark at the time of the accident and plaintiff had a flashlight in hand. The accident report fixes the time of the accident at 0300.

13. During trial there was conflicting evidence over which lash down pocket plaintiff stepped in. The Court finds it not necessary to identify the exact pocket. The parties also dispute the amount of light at the time of the accident. The Court finds that at all times material plaintiff knew that the barge had numerous lash down pockets and that they were difficult to see at night. This was the reason plaintiff was using a flashlight at the time of the accident. In addition, the barge was somewhat illuminated by both lights from the Sitka dock and the tug's forward flood and other lights that illuminated portions of the barge.

14. Prior to the accident on November 20, 2002, plaintiff testified he had stepped into the barge's lash down pockets on prior occasions. This is contrary to plaintiff's admission of Fact 20 where he admits that prior to the injury he had never stepped into one of the lash down pockets. See Ex. A-30 at pg. 6. Other crew members of the tug had also previously stepped into this known hazard and had even joked about stepping into the lash down pockets from time to time before the accident with plaintiff. Plaintiff contends the defendant should have inspected the barge to determine if it was safe before sending plaintiff aboard the barge to work. The lash down pockets were a known hazard and plaintiff was fully aware of their presence on the barge. No inspection would have discovered facts which plaintiff did not already know relating to the lash down pockets.

15. Mud and other debris were frequently found in the lash down pockets on the barge. The mud and other debris found in the lash down pockets of the BARANOF PROVIDER usually came aboard the barge in Sitka by way of large industrial forklifts carrying containerized cargo. The cargo yard in Sitka consisted of dirt and gravel. While in Sitka and other ports served by the WESTERN MARINER and the barges it towed, plaintiff regularly worked aboard the barges lashing and unlashing containerized cargoes. Plaintiff explained at trial that his responsibilities on the deck of the barge included, in addition to lashing and unlashing cargo, the clearing or cleaning out of the lash down pockets of mud

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 5

and other debris to allow for lashing gear to be secured to, or removed from, the pockets. The deck of the barge and these lash down pockets were last cleaned about one week prior to the accident.

16.   In addition to the lash down pockets recessed in the deck of the BARANOF PROVIDER, the barge had other potential hazards about which plaintiff and the other crewmembers were well-aware. Tripping hazards included turnbuckles, chains, and unattended lines on deck. Overhead hazards included a lashing chain attached to the shipping containers and leading to the side-rails ("fence") on the barges. Snow and ice would be present aboard the barge in winter months.

17.   There was conflicting evidence as to whether plaintiff was running or walking at the time of the accident. At his deposition taken on November 21, 2005, Exhibit A-19, pgs. 117-18, plaintiff said he was running at the time of the accident. At trial plaintiff testified he was running at the time of the accident. Plaintiff's trial brief at page 3 states "as he ran . . ." he stepped in the lash down pocket. He also testified he told Captain Buotte he was running when the Captain was filling out the accident report. As noted in Finding of Fact 12, the report states plaintiff was "walking" at the time of the accident. See Exhibit 9. In subsequent communications with medical providers, plaintiff stated he was running. See, for example, Deposition Testimony of Joseph Noonan, Exhibit A-49 at 11-12. The Court finds, based on plaintiff's testimony, that he was running. The decision to run on the barge immediately before the accident was solely plaintiff's decision. No witness (other than plaintiff) saw plaintiff run or walk at the time of the accident. The Court finds not credible plaintiff's testimony that he had run before on the barge deck and that the Captain and Mate, observing this running, failed to warn or otherwise instruct plaintiff not to run. There was no emergency that required plaintiff to be running. He knew that running was not permitted aboard any Western Towboat vessel or barge. He knew that running aboard a wood-deck cargo barge with lash down pockets in the dark was hazardous. Plaintiff should not have been running aboard the barge and this running caused the accident.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 6

18. The Court finds that prudence and vigilance are necessary when moving about the wood-deck of the BARANOF PROVIDER and other similar barges. Plaintiff was well-aware of and needed no further training, instruction or warning about the lash down pockets or running or walking on deck. He knew very well the conditions aboard the barge and the obvious danger of moving across a dark barge deck. Plaintiff agreed at trial that any notice or warning about the lash down pockets would have been something he already knew.

19. The logbooks of the WESTERN MARINER for the 2002 period indicate the WESTERN MARINER and its towed barges were in port, loading and unloading cargo, on a near-daily basis throughout the year. Western Towboat did not control the schedule of the barges or its cargo. Its customer – the owner, manager and/or operator of the barge – determined the ports and schedules for the movement of the WESTERN MARINER and its barges.

20. The BARANOF PROVIDER was, according to the testimony at trial, washed down by hose approximately twice yearly in Sitka. The cleaning involved the use of high-pressure water and a fire hose and would occur only when the barge was free of cargo and the crew had sufficient time between ports and cargo operations.

21. On November 13, 2002, the logbooks of the WESTERN MARINER indicate the BARANOF PROVIDER was cleaned while alongside the dock in Sitka. See Exhibit 65; A-14 (6 ½ hours). Plaintiff was in the service of the WESTERN MARINER at the time of the cleaning. Neither Captain Buotte nor Mate Miller were aboard the tug at that time. Plaintiff testified at trial that the barge was thoroughly cleaned and the lash down pockets ridden of mud and other debris at that time.

22. Between November 13, 2002, and November 20, 2002, the barge was only at the Sitka port involved in cargo operations for about four hours. The boat and barge did not visit any other ports during this stated period where forklifts drove onto and off of the barge.

23. Plaintiff argued at trial that yellow paint surrounding the lash down pockets or, perhaps, steel diamond plating might have prevented his injury. Plaintiff offered no credible

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7

testimony or evidence that yellow paint would have, or could have, been seen aboard the barge or whether it could have somehow prevented his injury.  Likewise, plaintiff offered no credible testimony or other evidence as to how diamond plating could have prevented his injury.  Plaintiff's expert testified that defendant violated regulations of the Occupational Safety and Health Act, (OSHA) 289 U.S.C. § 651 et seq., because the lash down pockets presented a tripping hazard which should have been marked.  OSHA does not apply to inspected barges like the BARANOF PROVIDER; nevertheless it provides some evidence.  The Court has considered the OSHA standards and finds and concludes these standards do not constitute evidence of negligence in this case.  Captain Greiner testified that there is reason to believe that had the lash down pockets been painted yellow, the accident might have been avoided.  However, the undisputed evidence is that these pockets were often filled with water and the deck of the barge covered with mud.  In addition, the plaintiff's accident occurred at night.  Plaintiff has failed to establish any causal connection between the possible use of yellow paint and the accident.  The Court further concludes that Captain Greiner has no experience or expertise relating to painted deck surfaces or whether and to what extent any painted surface would remain on the barge deck or be otherwise visible given the use of the deck.  Greiner is not a paint expert and has no basis for his opinion about paint.  The opinions have no scientific basis and Greiner lacks any technical specialized knowledge to offer opinions on paint related issues.  The Court previously granted defendant's motion to exclude Greiner's opinions about paint longevity.  See Minutes, October 30, 2007, docket  no. 56.

24.    Prior to the accident the Captain warned the crew, including plaintiff, to "watch where you step."  Plaintiff did not testify as to any additional training, instructions or warnings which could have prevented his injury.  In light of plaintiff's own testimony that any such instruction or training would have simply informed plaintiff of something he admittedly already knew, the Court finds that any absence of training, instruction or warning did not cause or contribute to plaintiff's injury.  Plaintiff has failed to establish that he was

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 8

not provided with a safe place to work.

25. The Court finds that the WESTERN MARINER was adequately manned with three persons (captain, mate and deckhand) on the morning of November 21, 2002. The size of the crew on the tug varied from 3-4 and was dependent on the barge size and cargo volume. A three member crew was appropriate for the tug on the day of the accident.

26. As a result of plaintiff's accident, he has sustained numerous surgeries and is expected to have additional surgery. The Court finds that Western Towboat has paid for all medical treatment provided to plaintiff since the November 20, 2002 injury to date and has agreed to pay any further cure required as a result of plaintiff's injury.

27. The Court finds that Western Towboat has paid plaintiff $25 per day as maintenance since the injury occurred.

28. Plaintiff has not proven beyond the preponderance of the evidence that defendant Western Towboat was negligent in (1) failing to provide a vessel reasonably fit for its intended purpose, (2) failing to properly man the vessel/barge, (3) failing to provide adequate lighting aboard the barge BARANOF PROVIDER, (4) failing to properly inspect the barge BARANOF PROVIDER to determine if it was a reasonably safe place to work before sending plaintiff aboard to work on November 20, 2002, (5) failing to make any effort to identify the dangerous condition of the lash down pockets, (6) failing to maintain a program for cleaning the lash down pockets or cleaning the dirt off the deck of the barge, or (7) failing to mark, warn, or identify (by paint or some other means) the recessed lash down pockets in order to avoid a tripping hazard.

## CONCLUSIONS OF LAW

1. This Court has admiralty jurisdiction over this matter under the general maritime law and the Jones Act, 46 U.S.C. § 30104. Venue is proper.

2. Plaintiff Jeremy Schouweiler was a seaman at all relevant times in the service of the WESTERN MARINER.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9

3. Under the Jones Act, the seaman's employer is bound to provide its seaman employees a "reasonably safe place to work." The employer is not liable when an injury arises solely from the ordinary and normal activities or risk of seaman's work in the absence of proof that the complained of injury was caused by employer negligence. Harrison v. Seariver Maritime, 2003 U.S. App. LEXIS 2472, 2003 WL 342266 at p. 5 (5th Cir. 2003). An employer simply is not required to protect (indeed, cannot protect) employees from all types of injuries. Id. Likewise, a vessel owner will not be held liable if a job could have been performed with reasonable safety, but the plaintiff was injured because he did it in an unsafe manner. Debose v. MS Loppersum, 438 F.2d 642, 642-43 (5th Cir. 1971); American Seafoods v. Nowak, 2002 U.S. Dist. Lexis 20255 (W.D. Wa. 2002).

4. There is no duty to instruct an experienced seaman on matters within common sense, or to remind him of what he already knew or should have known. Cole v. Dolphin Towing, LLC, 2005 WL 195519 *7 (E.D. La. Jan. 27, 2005)(citing Vendetto v. Sonat Offshore Drilling Co., 725 So.2d 474 (La. 1999); Grover v. Am. President Lines, Inc., 1995 AMC 2105 (N.D. Cal. 1995).

5. The Jones Act provides a cause of action in negligence for seaman injured in the course of employment. To prove negligence under the Jones Act, plaintiff must show duty, breach, notice, and causation. Ribitzki v. Canmar Reading & Bates, Ltd., 111 F.3d 658, 662 (9th Cir. 1997). The mere fact that a seaman suffers an injury does not create liability; rather, the seaman must prove the existence of negligence on the part of his employer. To recover, the seaman must prove that his employer's negligence played "any part, even the slightest, in producing his injury." Ribitzki, 111 F.3d at 664 (quoting Lies v. Farrell Lines, Inc., 641 F.2d 765, 771 (9th Cir. 1981)); see also Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 506 (1957). Plaintiff has failed to meet his burden to establish that his injury was caused by any negligence on the part of his employer.

6. The seaman's duty of care is not a "slight" duty of care to protect himself from the employer's negligence. Rogers v. Missouri Pacific. Rather, the seaman is also obliged to

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 10

act "with ordinary prudence under the circumstances." Id.  The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education.  Gautreaux v. Scurlock Marine Inc., 107 F.3d 331, 339 (5th Cir. 1997).

7. The quantum of negligence needed to establish causation under the Jones Act is slight, but it must still be proven by a preponderance of the evidence.  In re Hechinger, 890 F.2d 202, 208 (9th Cir. 1989), cert. denied, 498 U.S. 848, 111 S. Ct. 136, 112 L. Ed. 2d 103 (1990).  An injury alone does not create Jones Act liability; the plaintiff must show that the employer's conduct fell below the required standard of care.  Gautreaux, 107 F.3d at 335.

8. The Court has considered the evidence presented at trial, the exhibits admitted into evidence, the arguments of counsel and, being fully advised, finds that plaintiff has not met his burden of showing that defendant was negligent under the Jones Act.

9. Plaintiff was involved on the morning of November 20, 2002, in the ordinary and normal activities and risks of working aboard a wood-deck cargo barge.

10. Not to run on the deck of a cargo barge in the dark is common sense. Defendant had no duty to instruct plaintiff (an experienced seaman) on matters within common sense, or to remind him of what he admittedly already knew and understood.

11. Defendant had no duty to inspect the barge for the conditions of its lash down pockets when any such inspection would only have informed plaintiff of something that was known and recognized by both plaintiff and defendant.  Any such failure to inspect the barge did not cause plaintiff's injury.

12. To establish unseaworthiness, a seaman must prove that a vessel or its parts and equipment are not reasonably fit for their intended purpose.

13. The owner of the vessel is not required to furnish an accident-free ship.  A vessel owner is not called on to have the best parts and equipment, or the finest of crews, but is required to have what is reasonably proper and suitable for its intended use.

14. As discussed above and for all the same reasons, the Court finds that plaintiff has not borne his burden of showing that the WESTERN MARINER was unfit for its intended use or that it was not properly manned.

15. The case of Cooney v. United States, 74 F.Supp. 26 (W.D. Wa 1946), relied on by plaintiff, does not support plaintiff's contention of negligence or unseaworthiness. In Cooney, the plaintiff was injured by a pad eye extending above the deck hidden by hatch boards that were "piled or strewn upon that deck in and about those padeyes." Id. at 27. Cooney fell as a result of the pad eye, which had been obscured. The Court specifically found that there was no evidence that plaintiff had been contributorily negligent. In contrast, in the present case, plaintiff knew about the existence of the lash down pockets and chose to run even in light of the known hazard.

16. As a result of plaintiff's right ankle injury, Western Towboat is obliged, as a matter of law, to continue to pay plaintiff $25 per day as maintenance until plaintiff reaches maximum cure. Western Towboat is also obliged to pay all medical costs related to plaintiff's treatment until the time of maximum medical cure.

17. The clerk is directed to enter judgment for Western Towboat Company against plaintiff.

DATED this 14th day of December, 2007.

                                                    Thomas S. Zilly
                                                   United States District Judge